The Full Commission has reviewed the award based upon the record of proceedings before the Deputy Commissioner and with reference to the errors alleged. Plaintiff argues that her condition of fibromyalgia was caused by her March 4, 1992 injury at work. After careful consideration, the Full Commission has determined that the plaintiff has not shown good grounds to amend the award. Therefore, the July 1, 1994 Opinion and Award is accordingly HEREBY AFFIRMED, and the findings of fact as set forth therein are hereby adopted by the Full Commission.
* * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties at the hearing as
STIPULATIONS
1. The Form 18 contained in the Industrial Commission's file was received into evidence at the time of the hearing as stipulated Exhibit #1.
2. The Form 19 contained in the Industrial Commission's file was received into evidence at the time of the hearing as stipulated Exhibit #2.
3. A packet of medical records regarding treatment of the plaintiff was received into evidence following the hearing as stipulated Exhibit #3.
4. Four pages consisting of a psychological evaluation by Dr. Rollins and a one-page evaluation by Dr. Newman were received into evidence following the hearing as stipulated Exhibit #2.
5. A Pre-Trial Agreement entered into by the parties prior to the hearing is incorporated herein by reference.
* * * * * * * * * * *
Based upon all of the competent evidence in the record, the Full Commission makes the following
FINDINGS OF FACT
1. At the time of the hearing plaintiff was a 35-year-old divorced female with two children and an eleventh grade education who sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer on March 4, 1992, when she hit her head on an open door for a mini-holder for a screwdriver. Plaintiff was not dazed and did not lose consciousness following this incident. She immediately informed her supervisor of this incident and continued performing her regular work duties for the remainder of the day.
2. Prior to March 4, 1992 plaintiff had been employed by defendant-employer for approximately four years. On March 4, 1992 plaintiff was employed by defendant-employer as an assembler, although at the time of this incident plaintiff was working on the line building tools. Plaintiff's job duties as an assembler required her to stand while she assembled a box, placed a saw in a box with accessories, closed the box, then placed the box into a bigger box or on a pallet. The average weight of the filled box was 6.2 pounds with a maximum weight of 13.2 pounds. Plaintiff's job also involved occasional stooping and frequent bending.
3. After plaintiff arrived home on the evening of March 4, 1992 she began experiencing head pain, and, thereafter, first sought medical treatment in the emergency room at Craven County Regional Medical Center on March 5, 1992. Skull x-rays were negative and plaintiff was prescribed Darvocet and returned to her duties. When plaintiff returned to work on March 5, 1992, defendant-employer provided plaintiff a with light duty job. Plaintiff was next seen by Dr. Hornbake on March 23, 1992, who continued to advise conservative treatment and prescribed Talwin-N to help plaintiff sleep.
4. On March 26, 1992 plaintiff saw Dr. DeGraw complaining of pain in the top and back of her head which increased when she bent over. Neurological and visual examinations remained unremarkable, and diagnosis was post-traumatic headaches. Plaintiff again was released to return to work duties although she was limited in activities requiring her to bend over.
5. Plaintiff continued to be treated by Dr. DeGraw who, on April 21, 1992, referred plaintiff to Dr. Muther, a neuro-psychiatrist. When seen by Dr. Muther on April 23, 1992, plaintiff complained of pain on the left side of her head which radiated into her left arm, which improved with Talwin. Neurological examination revealed spasm of the left trapezius muscle and a painful knot in that muscle; however, otherwise, the examination remained unremarkable. Dr. Muther referred plaintiff for cervical spine x-rays, CT scan of the brain and EEG which were all normal. Dr. Muther felt plaintiff's complaints would gradually resolve and noted that there was a "functional component" present.
6. On April 29, 1992 plaintiff contacted Dr. Muther complaining of severe headaches; however, when re-seen that day, her complaints were felt to be "out of proportion" to the objective findings. Nevertheless, plaintiff was referred for a SPECT scan and computerized BEAM and an EEG to rule out the possibility of a closed head injury. These tests were also negative.
7. During this time plaintiff continued performing light duty employment for defendant-employer except for the days when she had doctor's appointments with Dr. Muther or Dr. DeGraw. Dr. Muther last saw plaintiff on April 27, 1992, and he continued to characterize plaintiff's headaches as uncomplicated post-traumatic headaches which should improve with time.
8. Thereafter, plaintiff continued under the care of Dr. DeGraw. By March 26, 1992 plaintiff was complaining of pain from her head down into her low back; however, she continued to perform light duty work for defendant-employer. Plaintiff's attendance record with defendant-employer reveals that she was only absent during the month of May approximately three and one-half days mainly attributable to doctor's appointments and one day of leave.
9. When re-seen by Dr. Degraw on June 1, 1992, plaintiff related that she was sleeping fine with her medications. However, she continued to feel that she was unable to work due to headaches. As of June 17, 1992, despite plaintiff's continuing objective complaints of pain, Dr. DeGraw felt that plaintiff was physically capable of performing her regular job duties as an assembler. By letter of June 25, 1992, Dr. Muther opined that plaintiff had reached maximum medical improvement. Thereafter, on July 8, 1992 plaintiff returned to her regular job duties for defendant-employer as an assembler.
10. Although plaintiff had a return appointment scheduled with Dr. DeGraw on June 19, 1992, she failed to keep that appointment instead presenting to the Beaufort County Hospital emergency room on June 16, 1992, where she was seen by Dr. Hardy to whom she related a history again of head pain increasing with walking or movement, associated with left arm numbness and, subsequently, approximately three weeks later developing neck and low back pain. It was noted also that plaintiff may have symptoms of depression. Medication was prescribed for that condition. Again, neurological examination was normal and Dr. Hardy concurred with Dr. Muther's opinion of plaintiff's condition as post-traumatic headaches. When plaintiff was re-seen on July 7, 1992, Dr. Hardy reviewed her CT scan, which he also interpreted as normal, and could find no physical explanation for plaintiff's complaints.
11. As of July 24, 1992 Dr. Hardy also opined that while plaintiff should be limited to light duty with only one-half day involving bending and lifting activities, plaintiff would gradually be able to resume full active duty. Defendant-employer provided plaintiff work within the restrictions imposed by Dr. Hardy. Thereafter, plaintiff returned to work for defendant-employer and continued engaging in work activities from July 25, 1992 through August 10, 1992, except for one day when she left early and one sick day.
12. Although not released by any physician from work duties, as of August 10, 1992 plaintiff began calling in sick and was subsequently terminated from her employment with defendant-employer on August 17, 1992.
13. The numerous evaluations of plaintiff failed to reveal any medical reason for her complaints. All of the treating physicians, even Dr. Hardy, whose treatment plaintiff sought on her own, felt that plaintiff was capable of engaging in work activities. In fact, plaintiff did continue engaging in work activities for defendant-employer from March 5, 1992 on a sustained basis until she last worked for defendant-employer on August 9, 1992. On December 13, 1992 plaintiff first saw Dr. Finestone, a psychiatrist, who diagnosed plaintiff's condition as fibromyalgia, a condition with symptoms of widespread pain for at least three months, difficulty sleeping and fatigue. There exists multitude of causes, some known and some unknown, for fibromyalgia, including physical illness, stress associated with psychological or social problems, and physical injury. In diagnosing fibromyalgia, the credibility and truthfulness of the patient's history and subjective complaints are of utmost importance. Also, a large percentage of persons with a pre-existing history of past stress or depression are vulnerable to developing fibromyalgia. In his evaluation, Dr. Finestone did not detect a psychiatric explanation for plaintiff developing fibromyalgia; however, he also did not have the benefit of an MMPI evaluation of plaintiff. The purpose of conducting an MMPI evaluation is to detect whether there is a personality problem either causing or resulting from the illness.
15. The MMPI evaluation performed as part of the psychological evaluation conducted by Dr. Rollins on November 13, 1992 revealed a "profile pattern consistent with serious depressive symptomatology superimposed on relative chronic andstable characterological difficulties" consistent with somatic delusions and a diagnosis of somataform pain disorder.
16. During the clinical evaluation conducted by Dr. Rollins, it is noteworthy that plaintiff also related a history inconsistent with the history she had related to others regarding her activities since the March 4, 1992 injury. For example, plaintiff related to Dr. Rollins that she had not dated anyone since her injury, but related using condoms for birth control to Dr. Ayers on November 25, 1992, and that she was sexually active to Dr. Larson on March 26, 1993. Furthermore, while plaintiff related to Dr. Ayers on November 25, 1992 that she used some alcohol since March 1992, she related to Dr. Rollins that she did not use alcohol. Plaintiff also informed Dr. Rollins that she had not driven a car since her injury although she had previously informed the rehabilitation nurse on March 6, 1992 that she continued to drive a car; and plaintiff testified at the hearing that she had driven a car until approximately August 1992.
17. Following review of plaintiff's prior medical evaluations, his clinical evaluation of plaintiff and review of the MMPI results, Dr. Rollins diagnosed plaintiff's condition as somatoform pain disorder, depression and possibly borderline intellectual function. Somatoform pain disorder is the preoccupation of an individual with pain in the absence of physical causes or in excess of what would be expected from the physical findings. In plaintiff's case, this somatoform pain disorder was "triggered" or "precipitated" by her minor injury which allowed the expression of pre-existing psychological problems. The depression diagnosed by Dr. Rollins may have pre-existed the injury or either resulted from the chronic pain associated with plaintiff's somatoform pain disorder. As regards to the diagnosis of fibromyalgia, Dr. Rollins did not confirm or deny that plaintiff suffers from fibromyalgia.
18. The undersigned afford more weight to the opinion of Dr. Rollins than the opinion of Dr. Finestone regarding the diagnosis and cause of plaintiff's condition. Prior to rendering his opinion, Dr. Rollins had the benefit of the MMPI evaluation and Dr. Finestone did not have the benefit of such testing which demonstrated that plaintiff had pre-existing characterological problems. Dr. Finestone attributing the condition of fibromyalgia to plaintiff's injury rather than a psychological cause for the development of said condition was based on the history related to him by plaintiff of no prior problems and was without the benefit of an MMPI evaluation. However, plaintiff has demonstrated that she is not always an accurate historian; and the MMPI evaluation conducted in November 1993 revealed that plaintiff, in fact, had pre-existing psychological problems.
19. Plaintiff's complaints of pain for which she sought medical treatment following the injury of March 4, 1992, and for which she continues to seek medical treatment, are not causally related to the injury plaintiff sustained on March 4, 1992. Rather, said injury merely "triggered" or "precipitated" the expression of plaintiff's pre-existing psychological problems. Therefore, plaintiff's loss of earning after August 9, 1992 was unrelated to the injury by accident giving rise to this claim.
20. Defendants did not authorize the medical treatment rendered plaintiff by Dr. Hardy and Dr. Finestone nor did the plaintiff seek approval of said treatment from the Industrial Commission. Furthermore, said treatment did not tend to effect a cure, to provide relief, or to lessen any period of disability related to the injury giving rise to this claim.
* * * * * * * * * * *
Based upon the findings of fact, the Full Commission makes the following
CONCLUSIONS OF LAW
1. While plaintiff's injury at work on March 4, 1992 may have "precipitated" or "triggered" the plaintiff's pre-existing psychological problems, the injury plaintiff sustained on March 4, 1992 did not cause plaintiff's present medical condition. N.C.G.S. § 97-2 (6); Brewington v. Rigsby Auto Parts, 69 N.C. App. 168,316 S.E.2d 336 (1984).
2. Plaintiff is not entitled to have the medical treatment provided to her after August 9, 1993 paid for by defendants.
* * * * * * * * * * *
Based upon all of the foregoing, the Full Commission has determined there exists no basis for amending the order denying plaintiff's claim for benefits.
This the _____ day of __________________________, 1994.
 S/ ___________________________ JAMES J. BOOKER COMMISSIONER
CONCURRING:
S/ _______________________ COY M. VANCE COMMISSIONER
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
JJB:mj 12/21/94